**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Mensch, Inc. DBA Full Moon Bar, | Case No.: 1:20-cv-6143 |
| Plaintiff, | |
| v. | (Jury Trial Demanded) |
| Society Insurance Company | |
| Defendant. | |

Plaintiff Mensch, Inc. DBA Full Moon Bar ("Plaintiff") brings this action against Society Insurance Company ("Defendant") for acts and omissions arising out of Defendant's failure to indemnify Plaintiff under the terms of its property insurance contract. In support thereof, Plaintiff states the following:

## I. INTRODUCTION

1. Plaintiff purchased property insurance coverage from Defendant as outlined in Plaintiff's Society Insurance Policy, policy number BP19008510-1 ("Plaintiff's Insurance Policy").

2. Plaintiff's Insurance Policy specifically provides for "Business Interruption Coverage" for lost income due to partial or loss or damage to property, "Extra Expense" coverage for necessary expenses incurred due to partial or total interruption of business resulting directly from loss or damage to property, and "Civil Authority" coverage for lost income during periods where insured-against perils cause damage to property other than at Plaintiff's property.

3.      On December 8, 2019, the first patient in Wuhan City, China was diagnosed with symptoms of a coronavirus infection, later identified as COVID-19 (the "Coronavirus").  By mid-January, the Coronavirus had spread to several other countries, including the United States.

4.      On January 30, 2020, the World Health Organization ("WHO") declared the spread of the Coronavirus a Public Health Emergency.[1]

5.      Despite the emergency declaration, governments were slow to respond.  Over the following 5 weeks, the Coronavirus spread across the globe, gaining significant footholds in the Middle East, Europe, and the United States.

6.      On March 11, 2020, the WHO declared the Coronavirus a global pandemic, stating it was "deeply concerned by the alarming levels of spread and severity, and by the alarming levels of inaction" to prevent the Coronavirus from spreading any further.[2]

7.      On March 16, 2020, the White House and CDC initiated a "30 Days to Slow the Spread" campaign to educate the public on the Coronavirus.[3]  As part of the campaign, it urged citizens to maintain adequate social distancing and follow the directions of state and local authorities.

8.      Following the CDC's guidelines, all but four states issued emergency civil authority declarations requiring non-essential businesses to close and non-essential workers to stay at or work from home.[4]  Certain local governments also enacted additional measures suspending business operations to combat the Coronavirus.

---

[1]     https://www.weforum.org/agenda/2020/04/coronavirus-spread-covid19-pandemic-timeline-milestones/

[2]     https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020

[3]     https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf

[4]     https://abcnews.go.com/Health/states-shut-essential-businesses-map/story?id=69770806

9.      These civil authority declarations were based in part on the fact that Plaintiff's premises' inherent characteristics posed significant health and safety concerns to the community in light of the Coronavirus' ability to transmit from person-to-person and surface-to-person, and were therefore no longer safe or fit for business purposes or public use.  They were also imposed due to the ubiquitous, widespread nature of the Coronavirus and the fact that it was an airborne pathogen.

10.      The widespread impact of the governmental shutdown measures have affected nearly all business sectors.  Indeed, when Illinois Governor J.B. Pritzker issued Executive Order No. 2020-07 on March 16, 2020 ordering "all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores, and food hall—[to] suspend service for and . . . not permit on-premises consumption," Plaintiff was forced to suspend its business operations, which resulted in lost business income.

11.      Plaintiff expected its all-risk insurance policy to insure against business income losses and extra expenses resulting from the Governor's Orders and from the damage caused by the Coronavirus.  However, when Plaintiff sought coverage for lost business income and extra under its Business Income Coverage, Extra Expense, and Civil Authority policy provisions, Defendant denied Plaintiff's claim.

12.      Plaintiff now seeks recovery under the terms of Plaintiff's Insurance Policy and alleges that Defendant is in breach of its insurance policy contract.  Plaintiff also seeks declaratory relief from the Court that its lost business income and extra expenses incurred are covered under the terms of its policy.

## II.     PARTIES

13.     Plaintiff is a Limited Liability Corporation with its principle place of business at 113 S Batavia Ave, Batavia, IL 60510.  Plaintiff is a citizen of Illinois and operates a bar and grill in Batavia, Illinois.  Plaintiff's Insurance Policy period runs from March 8, 2020 to March 8, 2021.

14.     Defendant is a mutual insurance company organized under the laws of Wisconsin and has its principal place of business in Fond du Lac, Wisconsin.  Defendant issued Plaintiff's Insurance Policy to protect against unforeseen events that may affect business income or extra expenses.

## III.     JURISDICTION AND VENUE

15.     This Court has personal jurisdiction over Defendant pursuant to Illinois' long-arm statute, 735 ILCS 5/2-209 because this action concerns (1) contacts that Defendant made to insure property and/or risk in Illinois, (2) business that Defendant transacted within Illinois, and (3) one or more contracts and/or promises Defendant made that are substantially connected with Illinois. 735 ILCS 5/2-209(a)(1), (4), (7).  This Court also has personal jurisdiction over this case because the insurance policy at issue was purchased, and covers property, in the state of Illinois.

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 exclusive of interests and costs and there is complete diversity between the parties.

17.     Venue is proper in this District because a substantial part of the events or omissions giving rise to these claims occurred in this district and Plaintiff resides in this district.

## IV.     FACTUAL ALLEGATIONS

**A.     The Coronavirus Pandemic**

18.     The Coronavirus was initially identified in Wuhan City, China, on December 8, 2019.[5]  On December 31, 2019, China informed the WHO that a cluster of pneumonia cases with unknown origin had emerged and infected a total of 44 individuals, 11 of whom were severely ill.[6]

19.     On January 7, 2020, genetic sequencing identified the source of the pneumonia outbreak as a new type of coronavirus, named COVID-19.[7]  SARS, MERS, and COVID-19 are part of the Conoraviridae family of viruses that can cause illnesses ranging from the common cold to respiratory symptoms, fever, cough, shortness of breath, and breathing difficulties.  In more severe cases, infection can cause pneumonia, severe acute respiratory syndrome, kidney failure, and even death.

20.     On January 11, 2020, Thailand announced the first Coronavirus case outside of China.[8]  The following day, the WHO announced there may have been human-to-human transmission of the Coronavirus, and cautioned that a wider outbreak was possible.

21.     On January 20, 2020, the US announced its first confirmed case of Coronavirus.[9] Ten days later, the WHO announced the Coronavirus outbreak constituted a Public Health

---

[5]     https://www.weforum.org/agenda/2020/04/coronavirus-spread-covid19-pandemic-timeline-milestones/

[6] https://www.who.int/csr/don/05-january-2020-pneumonia-of-unkown-cause-china/en/

[7] https://www.who.int/csr/don/12-january-2020-novel-coronavirus-china/en/

[8]     https://www.who.int/news-room/detail/13-01-2020-who-statement-on-novel-coronavirus-in-thailand

[9] https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html

Emergency of International Concern[10] and issued a Strategic Preparedness and Response Plan to address the growing spread of the virus.[11]

22.     During February 2020, Coronavirus cases mounted across the globe, particularly in Europe, Iran, South Korea, and the United States.  Governments started issuing shutdown orders at the end of February.

23.     On March 11, the WHO deemed the Coronavirus a global pandemic.[12]  That same day, the total number of confirmed Coronavirus cases in the United States surpassed 1,100.[13]

24.     By March 17, 2020, all fifty U.S. States had reported confirmed cases of Coronavirus.

25.     As of April 23, 2020, more than 2.5 million globally confirmed Coronavirus cases were reported to the WHO, with over 800,000 coming from the United States.[14]

**B.     Methods of Coronavirus Transmission**

26.     While transmission of the Coronavirus is not yet fully understood, researchers have documented both human-to-human and surface-to-human transmission of the virus.[15]

---

[10] https://www.who.int/news-room/detail/08-04-2020-who-timeline---covid-19
[11]     https://www.who.int/publications-detail/strategic-preparedness-and-response-plan-for-the-new-coronavirus
[12] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020
[13] https://www.nytimes.com/2020/03/10/world/coronavirus-news.html
[14] https://covid19.who.int/
[15]     *See*    https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (Coronavirus able to exist for hours on surfaces); *see also*  https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (Coronavirus spreads through aerosolized droplets expelled from humans)

27.     Most commonly, Coronavirus is spread through airborne, aerosolized droplets from an infected person.  Studies have found that Coronavirus can travel in aerosolized droplets up to 27 feet.[16]

28.     However, indirect contact with surfaces or objects touched by an infected person can also lead to infection.[17]  On March 27, 2020, the CDC issued a report on Coronavirus outbreaks on cruise ships and found that the Coronavirus was identified on a variety of surfaces up to 17 days after cabins had been vacated.[18]  Other studies from the New England Journal of Medicine have found that the Coronavirus lasts on surfaces at room temperature for up to 3 days.[19]  Recently, Australian researchers found that the Coronavirus can last up to 28 days on banknotes, glass, and stainless steel.[20]

## C.     Governmental Response to the Coronavirus

29.     On March 16, 2020, the White House and CDC initiated a "30 Days to Slow the Spread" campaign to educate the public on the growing threat of the Coronavirus.[21]  The campaign urged citizens to maintain adequate social distancing of at least 6 feet, avoid discretionary travel, and follow the directions of state and local authorities.  It also urged citizens to self-isolate if they or anyone they reside with feels sick or tests positive for the Coronavirus.

30.     Beginning in March, State and local governments across the country issued civil authority orders in response to the rapid spread of the Coronavirus by taking the following actions:

---

[16] https://www.usatoday.com/story/news/health/2020/03/30/coronavirus-social-distancing-mit-researcher-lydia-bourouiba-27-feet/5091526002/

[17] https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820

[18] https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w

[19] https://www.nejm.org/doi/full/10.1056/NEJMc2004973

[20]     https://www.usnews.com/news/top-news/articles/2020-10-11/novel-coronavirus-survives-28-days-on-glass-currency-australian-researchers-find

[21] https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf

a.    **Stay at Home orders**: 42 states required non-essential workers to remain indoors at home;

b.    **Non-Essential Business Closures**: 35 states closed non-essential businesses, including bars, restaurants, hotels, salons, gyms, schools, and wineries;

c.    **Bars/Restaurant Limitations**: 47 states closed bars and restaurants except for takeout/delivery; and

d.    **Large Gatherings Ban**: 18 states prohibited all gatherings and 26 states prohibited 10 or more people from gathering, including for sporting events, concerts, theaters, and parades.[22]

31.    Moreover, the scientific community at large, including the World Health Organization, has recognized that the "Coronavirus is a cause of real physical loss and damage."

32.    On March 16, 2020 Illinois governor J.B. Pritzker issued Executive Order No. 2020-07 ordering "all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores, and food hall—[to] suspend service for and . . . not permit on-premises consumption."[23]  Executive Order 2020-55 extended this shutdown through October 17, 2020.[24]

33.    On March 20, 2020, Governor Pritzker issued Executive Order No. 2020-10 which stated "[a]ll business operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses may also continue operations consisting exclusively of

---

[22] https://www.kff.org/coronavirus-policy-watch/this-week-in-coronavirus-april-10-to-april-17/
[23] https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-07.aspx
[24] https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-55.aspx

employees or contractors performing activities at their own residences (i.e., working from home). All Essential Businesses and Operations are encouraged to remain open. To the greatest extent feasible, Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Executive Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line"[25] (Collectively, "the Governor's Orders").

34.    As a result, Plaintiff was forced to completely shut down from March 16, 2020 to July 1, 2020. Plaintiff has only been able to operate at approximately 25% capacity since reopening.

35.    To date, there have been 14,467 confirmed cases of Covid-19 in Kane county, where Plaintiff resides.[26]

**D.    Plaintiff's Insurance Policy**

36.    Plaintiff's Insurance Policy is an "all risk" property insurance policy, meaning that coverage applies to all Covered Causes of Loss except those explicitly excluded.

37.    In return for Plaintiff's premium payments, Defendant provides Business Income, Extra Expense, and Civil Authority coverage that indemnifies Plaintiff for lost business income if the business: (1) sustains partial or total interruption of business resulting directly from loss or damage to property; (2) incurs extra expenses; or (3) is shut down due to orders of Civil Authority.

38.    Plaintiff's insurance policy states "We will pay for direct physical 'loss' of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."

---

[25] https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-10.aspx
[26] https://www.nytimes.com/interactive/2020/us/illinois-coronavirus-cases.html (last accessed Oct. 14, 2020)

39.     Plaintiff's Business Income coverage provision states:

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to covered property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

40.     Plaintiff's Extra Expense coverage provision states:

We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to covered property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

41.     Plaintiff's Civil Authority coverage provision states:

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within the area; and Page 8 of 32 © Society Insurance, Inc., 2015. TBP2 (05-15)

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property

42.     The policy does not define the phrase "direct physical loss or damage[.]"  However, the disjunctive "or" in the phrase "physical loss or damage" means that coverage is triggered if either a physical loss of property or damage to property occurs.  The concepts are separate and distinct and cannot be conflated.

43.     The presence of the coronavirus in the air and its attachment to surfaces of the premise constitutes direct physical damage to the premises because it renders the property unsafe for human occupancy and continued use.  In other words, continued use of Plaintiff's business

10

premises would have presented an inherent and unreasonable risk of harm to Plaintiff and Plaintiff's employees, staff, and customers. The ubiquitous presence of COVID-19 also damaged property surrounding Plaintiff's business premises, causing the issuance of civil authority orders that prevented Plaintiff from accessing and using his property as intended.

44.     Plaintiff's Insurance Policy does not contain a "virus exclusion" that excludes coverage for losses resulting from viruses.

**E.     Plaintiff Suffered Loss or Damage Resulting from the Coronavirus Pandemic**

45.     As a result of the Governor's Orders and the ubiquitous nature of the coronavirus, Plaintiff suffered physical loss and property damage because it was unable to conduct on-premise sales of food and beverages and was forced to shut down its business operations to comply with the state shutdown order and prevent the spread of COVID-19 to and on its premises.

46.     Plaintiff operates the type of business the Governor's Orders were designed to impact. Due to the large number of customers that, during normal operations, would be present on Plaintiff's business premises, the property presents a high risk of transmission and contraction of the coronavirus which may be prevented only by shutting down the business.

47.     Plaintiff has incurred, and continues to incur, substantial lost business income and additional expenses covered under Plaintiff's insurance policy. To date, Plaintiff has only been able to reopen at 25% capacity at its business location.

48.     Plaintiff provided timely notice of its losses to Defendant of its claim for the interruption of its business.

49.     Defendant denied Plaintiff's claim, stating that it was not a covered cause of loss under the terms of the insurance policy.

50.     In being denied coverage, Plaintiff has been injured by Defendant for its refusal to indemnify Plaintiff for business income losses, extra expenses, and civil authority closures under the terms of its policy.

**F.     Plaintiff's Losses Arose from a Covered Cause of Loss**

51.     Plaintiff's Policy covers its business income losses, extra expenses, or both suffered at the onset of the coronavirus pandemic for five separate reasons.

**i.     The Governor's Shutdown Order Resulted in Direct Physical Loss and Damage of Plaintiff's Property.**

52.     Plaintiff suffered a "Covered Cause of Loss" when it the Governor of Illinois issued its shutdown order that prevented Plaintiff from using its business premises as intended.  Under Plaintiff's Policy, a "Covered cause of Loss" occurs when Plaintiff's property suffered "direct physical loss or damage."

53.     The Governor's Order mandated that all restaurants that offer food or beverages for on-premises consumption suspend such services.  The Governor's order prohibited Plaintiff and its employees, customers, and suppliers from conducting on-premises food and beverage consumption and thus, from utilizing its premises for its intended purpose.

54.     As a result of the Governor's order, Plaintiff lost the ability to conduct business on its premises and distribute products to customers.

55.     In response to the Governor's Order, Plaintiff was forced to suspend its business operations.  Plaintiff, as a result, suffered the complete loss of its business income during the time the Governor's order remained in effect, and for which Defendant is obligated to indemnify Plaintiff.

56.     Therefore, the Governor's order resulted in direct physical loss and damage because it rendered Plaintiff's property completely unusable and prevented Plaintiff from using its property

for its intended function. That complete loss of use and impairment of function constitutes a physical loss or damage to property, for which Plaintiff is entitled to recover.

    **ii.    The Presence of the Virus Caused Direct Physical Loss and Damage to Plaintiff's Property.**

57.    The coronavirus pandemic and the ubiquitous nature of the Coronavirus separately caused direct physical loss or damage to Plaintiff's covered property. The Coronavirus is known to disseminate through the air and attach to surfaces and is capable of being spread person-to-person The widespread, prevalent, and highly contagious nature of the virus and the numerous customers and staff present at Plaintiff's business location indicates that, under normal operating conditions, the virus would be present on Plaintiff's business property and would be capable of injuring and threatening to injure Plaintiff's customers and staff. The presence of the virus at Plaintiff's business premises constitutes a physical loss and property damage because it makes Plaintiff's business premises completely unusable for its intended purpose.

58.    The Coronavirus damaged plaintiff's property by attaching and affixing itself to surfaces and contaminating the air and surfaces within plaintiff's premises. Given the Coronavirus' methods of transmission and the number of confirmed cases in Kane county, Plaintiff's premises were damaged by the presence of the Coronavirus.

    **iii.    Plaintiff is Covered Under the Policy's Business Income Coverage Provision.**

59.    The ubiquitous nature of the Coronavirus and the Governor's Orders caused direct physical loss or damage to Plaintiff's covered property, resulting in actual loss of business income as understood within the meaning of Plaintiff's Business Income policy provision.

60.    The physical loss or damage to Plaintiff's property requires Defendant to indemnify Plaintiff for business income losses pursuant to Plaintiff's Business Income policy provision. Plaintiff's business was closed due to a covered cause of loss not excluded from the policy, namely,

loss of use resulting from the Governor's Orders and physical damage independently caused by the Coronavirus.

61.     Plaintiff's business closure resulted in a loss of business income due to the necessary suspension of Plaintiff's operations, for which Defendant is liable to indemnify under its Business Income policy provision.

**iv.     Plaintiff is Covered Under the Policy's Civil Authority Coverage Provision.**

62.     The ubiquitous nature of the Coronavirus also caused direct physical loss or damage to property other than Plaintiff's covered property, and such loss or damage resulted in an action by civil authority that prohibited access to Plaintiff's covered property as understood within the meaning of Plaintiff's Insurance Policy.

63.     The Governor's order requires Defendant to indemnify Plaintiff for its losses through Plaintiff's Policy's Civil Authority Coverage.  The Governor's order was issued, in part, as a response to dangerous physical conditions and property damage at nearby premises. Specifically, the Civil Authority Orders closed other nearby businesses, within one mile of Plaintiff's business, due to other premises' Coronavirus contamination and prevented on-premises consumption of food and beverages there.

64.     The presence of the coronavirus near and around Plaintiff's property constituted physical loss and property damage of the neighboring property.

65.     As a result of that property damage, and to prevent further spread of the virus which would cause further property damage, the Governor of Illinois ordered non-essential businesses to shut down.

66.     As a result of the Governor's Order, Plaintiff lost access its property.  Specifically, the Governor's Order prevented Plaintiff and its employees, customers, and suppliers from

conducting on-premises food and beverage consumption and thus, from utilizing its premises for its intended purpose.

67. As a result of the civil authority order (*i.e.* the Governor's Orders), Plaintiff suffered losses because it could not access and use its business as intended. Under Plaintiff's Policy, Defendant must indemnify those losses caused by the Governor's Order.

**v.      Plaintiff is Covered Under the Policy's Extra Expense Coverage Provision.**

68. The ubiquitous presence of the Coronavirus and the Governor's Orders also triggered coverage under Plaintiff's Extra Expense policy provision.

69. In an effort to avoid or minimize the suspension of business and to continue operations, Plaintiff reopened its premises at approximately 25% capacity in July 2020. To do so, Plaintiff was required to employ extra health and safety precautions, including daily special sanitizing of its premises, enforcing social distancing guidelines, requiring masks to be worn, and operating different—and shorter—business hours than typical.

70. As a result of these measures, Plaintiff incurred costs that otherwise would not have been incurred and lost revenue due to changes in capacity and operating hours.

71. Such expenses, both in actual and opportunity cost, are covered under Plaintiff's Extra Expense policy provisions and are losses which Defendant must indemnify Plaintiff for.

**G.      The Insurance Industry's Response to the Civil Authority Orders**

72. On information and belief, no insurer intends to cover losses caused by any civil authority orders.

73.     Several insurance companies and industry groups have made it their position that "Business interruption policies do not, and were designed to, provide coverage against communicable diseases such as COVID-19."[27]

74.     For example, The Hartford's website states: "Most property insurance includes business interruption coverage, which often includes civil authority and dependent property coverage. This is generally designed to cover losses that result from direct physical loss or damage to property caused by hurricanes, fires, wind damage or theft and is not designed to apply in the case of a virus."[28]

75.     Similarly, Travelers Insurance claims:

> Insurance for business interruption can provide coverage when a policyholder suffers a loss of income due to direct physical loss or damage to covered property at its location or another location. It does not cover loss of income due to market conditions, a slowdown of economic activity or a general fear of contamination. Nor does the policy provide coverage for cancellations, suspensions and shutdowns that are implemented to limit the spread of the coronavirus. These are not a result of direct physical loss or damage. Accordingly, business interruption losses resulting from these types of events do not present covered losses under our property coverage forms. Even if there has been direct physical loss or damage to property, your policy contains a number of exclusions that are likely to apply to business interruption losses. The most important exclusion to note is the exclusion for losses resulting from a virus or bacteria, which would include coronavirus.[29]

76.     Additionally, several state departments of insurance have issued advisories claiming that losses from the Coronavirus are excluded losses.[30]

---

[27] https://www.insurancejournal.com/news/national/2020/03/20/561810.htm
[28] https://www.natlawreview.com/article/contractual-distancing-pandemic-insurance-litigation-spreads-business-interruption
[29] *Id.*
[30] *See* https://www.oci.ga.gov/ExternalResources/Announcements/Bulletin-3172020-1619.pdf; *see also* https://insurance.ks.gov/documents/department/COVID19-FAQ.pdf

77.     These misleading statements ignore the fact that Plaintiff's losses arose from Civil Authorities closing and Plaintiff's business based on the belief that the inherent nature of the premises was fundamentally dangerous for humans during the Coronavirus pandemic.

78.     Insurance companies taking this uniform position against coverage, without properly evaluating claims, has caught the attention of several Federal and State officials.

79.     In California, insurance commissioner Ricardo Lara issued a notice requiring insurance companies to fairly investigate all business interruption claims caused by COVID-19.[31]

80.     Congresswoman Pramila Jaypal also sent a letter to Chubb Group, QBE Holdings, Tokio Marine Insurance Group, Liberty Mutual Insurance Co., Mutual of Enumclaw Insurance Co., Oregon Mutual Insurance Co., Traveler Indemnity Co., BankDirect Capital Finance, and Nationwide Mutual Insurance Co. expressing concern over the devastation small and medium-sized businesses face when carriers deny coverage for business losses, claiming insurers "should honor all clearly covered coronavirus-related losses" and work with states to resolve disputes quickly.[32]

81.     President Trump also weighed in on insurance companies blanket denial of business interruption claims, stating "you have people that have never asked for business-interruption insurance and they have been paying a lot of money for a lot of years for the privilege of having it an then when they finally need it, the insurance company says 'we're not going to give it. We can't let that happen. . . I would like to see the insurance companies pay if they need to pay, if it's fair. And they know what's fair."[33]

---

[31] http://www.insurance.ca.gov/0400-news/0100-press-releases/2020/release039-2020.cfm
[32] https://www.natlawreview.com/article/contractual-distancing-pandemic-insurance-litigation-spreads-business-interruption
[33] https://www.insurancejournal.com/news/national/2020/04/14/564744.htm

82.     Other state governments, including New Jersey, Ohio, and Massachusetts, have introduced legislation that would mandate insurers cover Business Interruption, Extra Expense, and Civil Authority claims resulting from the Civil Authority Orders.[34]

83.      Despite the attention this issue has garnered, the insurance industry, and Defendant in particular, continues to deny claims for Business Interruption, Extra Expense, and Civil Authority coverage due to Governmental Shutdowns.  A declaratory judgment determining that business income, extra expense, and civil authority provisions applies to business income losses and expenses resulting from Civil Authority Orders, and other relief, is necessary to prevent Plaintiff from being denied critical coverage for which it has paid and is entitled to.

## V.     CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT

84.     Plaintiff repeats all allegations set forth in the preceding paragraphs as if fully set forth herein.

85.     Plaintiff's Insurance Policy is a contract under which Plaintiff paid premiums in exchange for Defendant's promise to pay Plaintiff's losses arising under its Business Income, Extra Expense, and Civil Authority policy provisions.

86.     Plaintiff has complied with all applicable provisions of the insurance policy, yet Defendant refuses to fulfill its obligation to indemnify Plaintiff for losses sustained as a result of the Civil Authority Order and/or the ubiquitous nature of the Coronavirus and to which Plaintiff is entitled.

---

[34] https://www.insurancejournal.com/news/east/2020/03/31/562855.htm

87. Defendant has denied Plaintiff's claims related to Business Income, Extra Expense, and Civil Authority coverage resulting from the Civil Authority Order and/or the ubiquitous nature of the Coronavirus.

88. A case or controversy exists between Plaintiff and Defendant with respect to Plaintiff's right to recover lost business income under its Business Income, Extra Expense, and Civil Authority policy provisions and Defendant's obligations to indemnify pursuant thereto. Plaintiff paid for Business Income, Extra Expense, and Civil Authority provisions to be included in its insurance policies, its business was ordered to close by Civil Authority Orders and was tainted by the Coronavirus, and Defendant denied Plaintiff's claims for business income losses under any policy provision resulting from these closures and/or the presence of the Coronavirus.

89. Plaintiff has an interest in this lawsuit, as its outcome will dictate whether business losses resulting from the Civil Authority Order and/or the presence of the Coronavirus are recoverable under its insurance policy.

90. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Plaintiff respectfully requests the Court declare the following:

    a. Plaintiff's Insurance Policy covers business income and other losses resulting from the Civil Authority Orders and/or the ubiquitous nature of the Coronavirus pursuant to its Business Income, Extra Expense, and Civil Authority insurance provisions;

    b. No coverage exclusions are applicable; and

    c. Defendant is obligated to indemnify Plaintiff for all covered business income losses sustained.

## COUNT II
## BREACH OF CONTRACT

91.     Plaintiff repeats all allegations set forth in the preceding paragraphs as if fully set forth herein.

92.     Plaintiff's Insurance Policy is a contract under which Plaintiff paid premiums in exchange for Defendant's promise to pay Plaintiff's losses arising under its Business Income, Extra Expense, and Civil Authority policy provisions.

93.     Plaintiff has complied with all applicable provisions of the insurance policy, yet Defendant refuses to fulfill its obligation to indemnify Plaintiff for covered losses sustained.

94.     Pursuant to Plaintiff's Insurance Policy, Defendant agreed to indemnify Plaintiff for:

   a.     "[L]oss of Business Income you sustain due to the necessary suspension of your 'operations'" under its Business Income policy provision;

   b.     "[N]ecessary Extra Expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to covered property at the described premises" under its Extra Expense policy provision; and

   c.     "[A]ctual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises" under its Civil Authority policy provision;

95.     The Governor's Orders resulted in physical loss or damage to Plaintiff's property by shutting down its business operations and declaring its premises unsafe and unfit for business operations and/or due to the ubiquitous nature of the Coronavirus. Plaintiff's inability to lawfully use its premises for business purposes constitutes an impairment of function that resulted in a

covered cause of loss or damage, or was otherwise damaged by the presence of the Coronavirus in and/or on Plaintiff's premise.

96.     The Governor's Orders were also issued in response to physical loss or damage at properties other than Plaintiff's and which were caused by a covered cause of loss.  Other premises in Plaintiff's vicinity posed such a danger to public safety that governmental authorities deemed it necessary to shut down Plaintiff's business operations and prohibit access to Plaintiff's property, as other properties had the Coronavirus on its premises.  The Governor's Orders prohibited Plaintiff from accessing its premises or conducting business.  Such action constitutes an impairment of function that triggered Plaintiff's Civil Authority clause and entitles Plaintiff to indemnification.

97.     The Governor's Orders also caused Plaintiff to incur extra expenses at its property. Specifically, Plaintiff incurred extra expenses to avoid or minimize the suspension of business and to continue operations by reopening its premises at approximately 25% capacity while employing extra health and safety precautions, including daily special sanitizing of its premises, enforcing social distancing guidelines, requiring masks to be worn, and operating different—and shorter— business hours than typical.

98.     Additionally, Plaintiff's premise was damaged by the presence of the Coronavirus in the air and on its surfaces.  The ubiquitous presence of the Coronavirus constitutes a direct physical loss or damage to Plaintiff's premises that are covered under the terms of Plaintiff's Insurance Policy.  Here, the presence of the virus physically damaged the surfaces of Plaintiff's tavern and rendered the premises uninhabitable or fit for its intended use.  Such damage and loss of use is a covered cause of loss and renders Defendant liable to Plaintiff under the terms of its insurance policy.

99. The physical damage resulting from the Coronavirus triggered Plaintiff's Business Income policy provision. Plaintiff's business was closed due to a covered cause of loss not excluded from the policy, namely, loss of use resulting from the Governor's Orders and physical damage independently caused by the Coronavirus.

100. The physical damage resulting from the Coronavirus also triggered Plaintiff's Extra Expense policy provision. To avoid or minimize the suspension of business, Plaintiff incurred extra expenses by reopening its premises at approximately 25% capacity, and employing extra health and safety precautions, including daily special sanitizing of its premises, enforcing social distancing guidelines, requiring masks to be worn, and operating different—and shorter—business hours than typical.

101. No policy exclusion applies to Plaintiff's claims.

102. Defendant breached its obligations to cover Plaintiff's business income losses and extra expenses incurred resulting from the Governor's Order and from physical damage caused by the Coronavirus when it denied coverage under its Business Income, Extra Expense, and Civil Authority policy provisions.

103. As a result of Defendant's breach, Plaintiff has sustained and continues to sustain damages for which Defendant is liable in an amount to be established at trial.

## VI.     PRAYER FOR RELIEF

104. **WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

    a.    A Declaratory Judgment declaring:

        i.    Plaintiff's insurance policy covers business income and other losses resulting from the Civil Authority Order and/or the ubiquitous

nature of the Coronavirus pursuant to its Business Income, Extra Expense, and Civil Authority insurance provisions;

ii.    No coverage exclusions are applicable to the facts of this case; and

iii.    Defendant is obligated to indemnify Plaintiff for all business income losses sustained in connection with the closure and limited reopening of Plaintiff's business due to Civil Authority Orders and/or the ubiquitous presence and nature of the Coronavirus.

b.    Awarding Plaintiff compensatory damages resulting from Defendant's breach of contract pursuant to Plaintiff's Business Interruption, Extra Expense, and Civil Authority policy provisions in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

c.    Attorneys' fees and expenses as allowable by law; and

d.    Awarding all other relief the Court deems just, proper, and equitable.

## VII.   JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated: October 15, 2020

*/s/ Robert J. Pavich*
Robert J. Pavich
Jeffrey A. Leon
**PAVICH LAW GROUP, PC**
30 W Monroe St., Ste. 1310
Chicago, IL 60603
Telephone: (312) 690-8400
rpavich@pavichlawgroup.com
jleon@pavichlawgroup.com

J. Gordon Rudd, Jr. (*Pro hac vice* forthcoming)
Brian C. Gudmundson (*Pro hac vice* forthcoming)
Bryce D. Riddle (*Pro hac vice* forthcoming)
Michael J. Laird (*Pro hac vice* forthcoming)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
gordon.rudd@zimmreed.com
brian.gudmundson@zimmreed.com
bryce.riddle@zimmreed.com
michael.laird@zimmreed.com

*Attorneys for Mensch, Inc. DBA Full Moon Bar*